**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DUDA et al.,** | : | |
| *Plaintiffs*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **STANDARD INSURANCE CO. et al.,** | : | **No. 12-1082** |
| *Defendants* | : | |

PRATTER, J.                                                                                          APRIL 30, 2015

## OPINION

Dr. John Duda, an orthopedic surgeon and co-owner of Northwest Orthopaedic Specialists, LLC ("Northwest"), applied for total and partial disability benefits under a policy issued by Standard Insurance Company ("Standard") (the "Group Policy") and under two personal insurance policies issued by Lincoln National Life Insurance Company ("Lincoln") (the "Personal Policies"). His claims for disability benefits were prompted by two accidents, one in 2000 and one in 2007, which, he contended, triggered his entitlement to benefits under the policies. Both insurers refused to pay benefits to Dr. Duda, and he filed suit. Northwest (as the Group Policy Sponsor) and Dr. Donald F. Leatherwood, II (as Dr. Duda's business partner and co-owner of Northwest) likewise sued Standard.

Plaintiffs and Standard have now filed cross-motions for summary judgment on Dr. Duda's claim for benefits under § 502(a)(1)(B) of ERISA (Count I) and the claims by Northwest and Dr. Leatherwood under § 502(a)(3) of ERISA (Count II). In addition, Lincoln moved for summary judgment on Dr. Duda's claims against Lincoln for breach of contract (Count III), bad

faith (Count IV), and residual disability benefits (Count V).[1] For the reasons that follow, the Court grants summary judgment for the Defendants.

## I.   FACTUAL BACKGROUND[2]

### 1.   Dr. Duda's Business

Dr. Duda and Dr. Leatherwood are board-certified orthopedic surgeons and business partners. They formed their business—Northwest—on March 27, 1998. Northwest is an orthopedic practice through which Dr. Duda and Dr. Leatherwood provide surgical and nonsurgical medical care to patients with orthopedic disorders. Dr. Duda and Dr. Leatherwood each own 50% of Northwest.

On the same day that Dr. Duda and Dr. Leatherwood formed Northwest, they also formed separate entities through which they individually provide medical-legal consulting services. Dr. Duda formed John Duda, M.D., P.C. ("Duda PC") and Dr. Leatherwood formed Donald F. Leatherwood, II, M.D., P.C. ("Leatherwood PC"). Dr. Duda and Dr. Leatherwood each own 100% of their respective consulting businesses, provide independent orthopedic medical examinations ("IMEs") and expert medical testimony through those entities, and serve as the president and the lone employees of their respective enterprises. All three businesses operate out of the same office. Northwest leases the space at no cost to Duda PC and Leatherwood PC, and Northwest employees coordinate the appointments of and payments to Duda PC and Leatherwood PC.

Dr. Duda received no W-2-reportable wages from Northwest, but took 50% of Northwest's profits. Dr. Duda's earnings from Duda PC significantly exceeded the income he

---

[1] The Court already denied Dr. Duda's motion for summary judgment against Lincoln as untimely. (*See* Order, Apr. 8, 2014 Order, ECF No. 292).

[2] The facts are undisputed unless otherwise noted. For purposes of summary judgment, record evidence is viewed in the light most favorable to the non-moving party, in this instance, Dr. Duda. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

received from Northwest every year. (Lincoln Statement of Undisputed Material Facts ("Fact Statement") ¶ 16).

           2.  <u>Dr. Duda's Practice</u>

The parties dispute the nature of Dr. Duda's practice. Dr. Duda contends that "open surgery,"[3] especially total joint replacement surgery, is his primary responsibility because that is the procedure around which he built his reputation and practice. Dr. Duda also performed a significant number of arthroscopic surgeries from 1998 to 2009. According to Dr. Duda's cash flow by procedure reports, the considerable majority of in-hospital procedures he performed before August 2007 were non-open procedures, such as arthroscopic surgery, joint aspirations, joint fixations, joint manipulations, and orthopedic injections. From 2002 to 2006, 92% of the 1,684 procedures Dr. Duda performed at the hospital were non-open procedures. (Standard Fact Statement ¶ 23). In addition, Dr. Duda's occupational duties included seeing, treating, and evaluating patients with orthopedic problems, and performing various orthopedic procedures in the office, including joint aspirations, orthopedic injections, fracture treatments, castings, and patient consultations. From 2002 to 2006, Dr. Duda performed 11,285 nonsurgical orthopedic procedures in the office—far exceeding the number of surgical procedures Dr. Duda performed over the same period.

Dr. Duda also performed (and continues to perform) IME work on behalf of Duda PC. Dr. Duda's IME work includes, but is not limited to, physically examining individuals claiming orthopedic injuries, reviewing medical records, preparing IME reports, summarizing his medical findings, and testifying in legal proceedings as an expert orthopedic surgeon. From 2001 to 2006,

---

[3] "Open" surgery involves making an incision with a scalpel, manipulating the muscle or bone underneath the skin, and closing the incision with sutures. In contrast, arthroscopic surgery is performed through a small puncture using a scope and usually requires less physical effort on the part of the provider.

Dr. Duda generated more than $1.8 million in wages and pension contributions from his IME work—more than 4 times the income he derived from Northwest during the same period. Dr. Duda's billings for Duda PC far exceeded his surgical billings on behalf of Northwest.

The parties agree that from 1998 to 2013, Dr. Duda's overall production as a surgeon diminished. However, the parties present slightly different accountings of Dr. Duda's performance. For example, Dr. Duda claims that he performed 392 procedures in 2004 (including 39 open surgeries and 353 non-open procedures, of which 172 were arthroscopic surgeries) and 330 procedures in 2006 (including 9 open surgeries and 321 non-open procedures, of which 165 were arthroscopic surgeries). Dr. Duda further claims that he performed over 1,000 procedures in 1999 (including 145 open surgeries and 874 non-open procedures, of which 342 were arthroscopic surgeries) and only 160 procedures in 2012 (including zero open surgeries and 42 arthroscopic surgeries). But Lincoln claims that he performed 395 procedures in 2004 (including 40 open surgeries and 355 non-open procedures) and 335 procedures in 2006 (including 8 open procedures and 327 non-open procedures). And in June 2009, in connection with Dr. Duda's claim for disability benefits, Standard concluded that Dr. Duda performed 2,158 orthopedic procedures in 2006 (including 588 surgeries), 2,304 orthopedic procedures in 2007 (including 530 surgeries), and 1,992 orthopedic procedures in 2008 (including 469 surgeries).

3.   Dr. Duda's Claims for Benefits

On March 5, 2009, Dr. Duda filed claims for disability benefits. He filed a claim with Standard under the Group Policy, and he filed claims with Lincoln under the Personal Policies. In those claims, he asserted that he was disabled beginning on August 10, 2007 as a result of two accidents: first, he injured his right hand when fell in 2000; second, a boating accident in 2007 caused him to see floaters. Summaries of the material facts relating to each of his claims follow.

A.  *Standard Insurance Claim*

i.  The Standard Insurance Policy

Standard issued the Group Policy to Northwest. The Group Policy is covered by ERISA. The Group Policy provides, "If you [(i.e., the insured)] become disabled under the Group Policy, we [(i.e., Standard)] will pay [long term disability ("LTD")] Benefits according to the terms of the Group Policy after we receive Proof of Loss." (STND 642). Proof of Loss is defined as "satisfactory written proof that you [(i.e., the insured)] are Disabled and entitled to LTD Benefits. Proof of Loss must be provided at your expense." (STND 649).

The Group Policy defines "Disability," "Own Occupation," and "Material Duties" as follows:

> You are Disabled if you meet one of the following definitions during the period it applies:
>
> A.      Own Occupation Definition of Disability;
> B.      Any Occupation Definition of Disability; or
> C.      The Partial Disability Definition that applies to you . . . .
>
> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with the Employer. Your Own Occupation is not limited to your job with your Employer.
>
> Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation.

(STND 630 (emphasis added)). The Group Policy lists both Northwest and Duda PC as "Employers." (STND 627)).

The Group Policy's Own Occupation Definition of Disability is as follows:

> During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury,
Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the
Material Duties of your Own Occupation.

(STND 631). For physicians, Own Occupation refers to that physician's "specialty in the practice

of medicine." (STND 630)

The Group Policy defines "Benefit Waiting Period" as "the period you must be

continuously Disabled before LTD Benefits become payable. No LTD Benefits are payable for

the Benefit Waiting Period." (STND 654). The Group Policy defines the "Own Occupation

Period" as the period from the end of the Benefit Waiting Period until the end of the Maximum

Benefit Period, where the Maximum Benefit Period sets the time when LTD Benefits will no

longer be paid to an insured who is Disabled. For Dr. Duda, the Benefit Waiting Period was 180

days.  Therefore, Dr. Duda would be entitled to recover LTD Benefits only after he submitted

written proof that he was Disabled for a 180-day period.

The Group Policy's "Partial Disability Definition" for Dr. Duda is as follows:

During the Benefit Waiting Period and the Own Occupation Period, you are Partially
Disabled when you work in your Own Occupation but, as a result of Physical Disease,
Injury, Pregnancy, or Mental Disorder, you are unable to earn the Own Occupation
Income Level or more.

Note: You may work in another occupation while you meet the Own Occupation
Definition of Disability. However, you will no longer be Disabled when you are able to
earn more than your Work Earnings Limit while working in another occupation.

(STND 631). The Group Policy defines "Work Earnings Limit" as "80% of your Indexed

Predisability Earnings," where Predisability Earnings are "based on your earnings in effect on

your last full day of Active Work . . . . Any subsequent change in your earnings will not affect

your Predisability Earnings." (STND 630, 644). The Group Policy defines "Active Work" as

"performing the material duties of your own occupation at your Employer's usual place of

business." (STND 653). Unlike the definition of Disability, the definition of Active Work does not use "own occupation" and "material duties" as defined terms.

As a separate limitation on the payment of LTD Benefits, the Group Policy provides: "You must be under the ongoing care of a Physician during the Benefit Waiting Period. No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of a Physician." (STND 649). A Physician is defined as "a licensed professional, other than yourself, diagnosing and treating you within the scope of the license." (STND 655).

The Group Policy's "Allocation of Authority" provision states that Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." (STND 650-51). Standard's authority includes the right to "resolve all matters when a review has been requested," "to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it," and to determine eligibility for insurance, entitlement to benefits, amount of benefits payable, and the sufficiency and the amount of information that may reasonably be required to make those determinations. *Id.*

The Group Policy's ERISA Summary Plan Description and ERISA Information and Notice of Your Rights list Northwest as the plan administrator, which, according to Dr. Duda, charges Northwest with a fiduciary duty to protect the interests of the employees covered by the Group Policy. (STND 104, 118-19).

ii.   The Standard Insurance Claim

Dr. Duda submitted a claim to Standard on March 5, 2009. In the Employee Statement section, Dr. Duda stated that his last date worked before disability was August 10, 2007. Dr. Duda wrote that he did not return or expect to return to work and explained that the cause of his

Disability were two accidents: first, he fell on his outstretched right hand in 2000, and second, a boating accident in 2007 caused him to see floaters. Dr. Duda described his "work activity . . . since the start of [his] disability" as including "[o]ffice patients and arthroscopic surgery," but stated that he has been "unable to perform total [joint] replacements or other open procedures." (STND 482-83).

Dr. Leatherwood filled out the Attending Physician Statement section of the claim and stated that Dr. Duda's diagnosis was "Scapholunate Dissociation with '[SLAC]' wrist [right] dominant hand." (STND 482). He described the symptoms as "pain, weakness, stiffness, loss of dexterity." (*Id.*). He stated that he recommended Dr. Duda stop working in August 2006. There was also an Attending Physician Statement from Dr. Benjamin Bloom, an ophthalmologist, diagnosing Dr. Duda with "vitreal detachment right eye and secondary large vitreal floaters that have not improved." (STND 483).

Standard consulted Doctor Bradley Fancher, a physician Board Certified in Internal Medicine, who evaluated all the information in the record and prepared two reports, dated June 17, 2009 and July 30, 2009. In his first report, Dr. Fancher opined based on the March 6, 2009 x-rays that it seemed "reasonable" that Dr. Duda would be "unable to use a reciprocating saw and unable to do total joint procedures" but able to "do arthroscopic surgery and see office patients" as Dr. Duda had asserted in his claim. (STND 68). Dr. Fancher further opined that vitreous floaters would not interfere with Dr. Duda's ability to do arthroscopic surgery. In his second report, Dr. Fancher reviewed additional information in the record and concluded that Dr. Duda was fully employed in 2008, and there was no record of a change in Dr. Duda's medical condition to explain the gradual reduction in the volume of his practice.

Standard also consulted Certified Rehabilitation Counselor Brendan Flynn to evaluate Dr. Duda's occupational activities. Mr. Flynn analyzed information about Dr. Duda's practice from 2006 to 2009, including CPT codes (standardized codes assigned to each procedure Dr. Duda performed) and the charges associated with those procedures and services. Mr. Flynn also reviewed Dr. Duda's tax returns for 2006 to 2008, concluding that the returns showed a relatively steady stream of income.

On August 6, 2009, Anthony Picco, Standard's claim administrator, informed Dr. Duda that Standard was denying his claim for LTD benefits under the Group Policy. Mr. Picco's letter explained:

> [I]n determining your Own Occupation, we were not limited in our review to how you perform your particular job at Northwest Orthopaedic Specialists or your other associated entities, nor are we limited in our review to a preference or particular concentration of procedures you prefer to perform within your occupational specialty. Our assessment focused on your ability and/or capacity to perform with reasonable continuity the Material Duties *generally required in your occupational specialty*, as that occupation is performed in the general economy.

(STND 402-03 (emphasis added)). After summarizing the information reviewed (including Dr. Duda's past and present practice, Dr. Duda's reputation as a knee specialist, and the impact Dr. Duda's limitations had had on his overall revenues and his ability to compensate somewhat through increased arthroscopic procedures, IMEs, and other business activities), Mr. Picco explained, "the vocational case manager determined that your Own Occupation, under the Group Policy Own Occupation definition, should be considered your medical specialty of Orthopaedic Surgery." (STND 404). Mr. Picco concluded that Dr. Duda "continued to perform a sizable quantity and variety of orthopedic medical procedures" after August 10, 2007, and that the CPT codes and billing records do not show that "joint replacements were as significant an area of practice as you have reported." (STND 405). Mr. Picco continued, "The available records

support that although you are limited from performing total joint replacements and using

reciprocating saws, you are still able to perform with reasonable continuity material duties within

your . . . specialty of orthopedic surgery." (STND 406). He concluded:

> To be eligible for LTD Benefits, the file record must reasonably support that *due to a Physical Disease and/or Injury* that you are precluded from performing with reasonable continuity the Material Duties of your Own Occupation and/or that *due to a Physical Disease and/or Injury* that you are precluded from earnings at the Own Occupation Income level continuously throughout a 180 day Waiting Period. We do not find sufficient support of either of these requirements. Instead, what the records document is that you have continued to work with reasonable consistency over the past 3 years and that you have required only minimal conservative medical treatment.

> In summary, based on our review of the available records, we do not find Proof of Loss, or substantiation that you have been continuous Disability [sic] as defined under the Definition of Disability throughout a 180 day Waiting Period for any period over the past 3 years. Therefore, we have no alternative but to deny your claim for benefits.

(STND 407 (emphasis in original)). Mr. Picco advised Dr. Duda of his right to appeal, and

reserved Standard's right to consider new information and grounds for granting or denying

benefits on appeal.

### iii.   Dr. Duda's Appeal

Dr. Duda appealed. Standard requested all medical records in Dr. Duda's possession, and

Dr. Duda responded that Standard already had all the medical documentation that existed. Dr.

Duda added that he had been self-treating for many years and had not kept any records

documenting treatment, nor had his partner Dr. Leatherwood kept records (it is not averred that

Dr. Leatherwood ever created records in the first instance) when Dr. Duda imposed on him for

treatment. Standard consulted Dr. Joseph Mandiberg, a Board Certified Orthopedic Surgeon,

who evaluated Dr. Duda's medical records and claim information. Dr. Mandiberg's report noted

that the information regarding Dr. Duda's SLAC wrist was sparse, but that Dr. Duda appeared to

have continued to work in his own occupation as an orthopedic surgeon in a full-time capacity through January 2009.

Sandra K. Bertha, the claims agent handling the appeal, notified Dr. Duda that his appeal was being denied in a letter dated November 6, 2009. She wrote:

> In order to be eligible for LTD benefits, the medical evidence received must support that you met the Group Policy's Definition of Disability from the date you claimed to be Disabled, which you reported was August 10, 2007. Although we note that you reported that you did not return to work or expected to return to work after this date, vocational information received documents that you have, in fact, continued to work in your Own Occupation as an Orthopedic Physician, to include performing a variety of orthopedic surgical procedures. This was explained in Anthony Picco's prior correspondence to you dated August 6, 2009 (copy enclosed). Because of this, we reviewed your file to determine if you satisfied the Group Policy's Partial Disability Definition.

(STND 408). The letter also stated, "Under circumstances regarding Disability as a result of a longstanding and/or progressive condition, it is reasonable for us to expect to find evidence of a notable worsening or progression of your condition as of or just prior to the date you claimed to be disabled (August 10, 2007) to reasonably support that you became Disabled as defined by the Group Policy. In this regard, Standard has not received any documentation of treatment for your right wrist contemporaneous to August 10, 2007." (STND 409). Ultimately, she found that "because records were not kept, we do not have satisfactory written proof substantiating that your condition precluded your ability to perform the Material Duties of your Own Occupation as of August 10, 2007, or even through the present." (STND 410). Ms. Bertha concluded that the evidence did not show that Dr. Duda was unable to perform with reasonable continuity the Material Duties of his Own Occupation, and that Dr. Duda was therefore not disabled.

### B.  Lincoln National Life Insurance Claim

#### i.  Lincoln Insurance Policy

Lincoln National is the successor insurer of the Personal Policies at issue in this case: (1) Policy No. 000528000A, which was issued to Dr. Duda in 1985, and (2) Policy No. 000664107, which was issued to Dr. Duda in 1989 (collectively "the Personal Policies"). (Lincoln Fact Statement ¶ 2).[4] The Personal Policies cover both total disability and residual disability. "Total disability" exists when "the insured, due to injury or sickness, cannot perform the main duties of his or her regular occupation." (Lincoln Fact Statement ¶ 3). In Policy No. 000528000A, "residual disability" means "the insured, due to injury or sickness, cannot perform all the main duties of his or her regular occupation full time, but: (a) can and is performing some of those duties; or (b) can perform all those duties, but not full time; or (c) is working at some other occupation." (Lincoln Fact Statement ¶ 4). At the same time, the insured "must be earning at least 20% less than his or her monthly earned income base." (*Id.*). Under Policy No. 000664107, "residual disability" is similarly defined.[5] Under the total and residual disability elements of the Personal Policies, the insured must "be under the regular care of a doctor" in order to recover, where "'Doctor' means a licensed physician, practicing within the scope of his license," who is not the insured. (Lincoln Fact Statement ¶ 6).

---

[4] Dr. Duda suggests that Policy No. 000528000 remains in effect, but the record evidence shows that it was terminated and replaced by Policy No. 000528000A, which provides a higher benefit amount and different policy terms. Dr. Duda has not paid premiums for Policy No. 000528000 for approximately 30 years and he never submitted a claim for disability benefits under Policy No. 000528000. To the extent Dr. Duda argues that Lincoln breached the Personal Policies when it failed to issue a "Specialty Letter" under Policy No. 000528000, his argument fails because that policy has not been in effect since 1985 and is not at issue in this case.

[5] "During the waiting period, residual disability means that the insured, due to injury or sickness, cannot perform all the main duties of his or her regular occupation full time, but: (a) can and is performing some of those duties; or (b) can perform all those duties, but not full time . . . . After the waiting period, residual disability means that the insured, due to injury or sickness, is: (a) earning at least 20% less than his or her monthly earned income base; and (b) under the regular care of a doctor." (Lincoln Fact Statement ¶ 5).

The Personal Policies further require that the insured submit written proof of loss, demonstrating "facts giving the time, nature, and extent of the loss," within "90 days after the end of the period for which benefits are payable." (Lincoln Fact Statement ¶ 7). Lincoln also "may require proof of the reduced monthly earned income, such as federal tax returns and other records." (*Id.*).

On March 5, 2009, Dr. Duda initiated a claim for disability benefits under the Personal Policies. According to the claim, Dr. Duda became "partially disabled" on August 10, 2007 because he was "no longer able to perform total joint replacement and open corrective surgery." (Lincoln Ex. 31). Dr. Duda claims he became disabled on August 10, 2007 because that is the day he decided to stop performing total joint replacement surgery due to his wrist condition. Although Dr. Duda admits he was able to perform and continued performing other types of "open" surgery from 2007-2009, Dr. Duda ultimately stopped performing such surgeries.

ii.   Lincoln National's Claim Investigation

Dr. Duda's claim was assigned to Kathleen Wallace, a claims examiner employed by Lincoln. After reviewing Dr. Duda's submissions, Ms. Wallace requested (a) medical and financial records, and (b) a supplemental attending physician statement. On May 29, 2009, Ms. Wallace received a letter from Dr. Duda with a completed progress report and supplemental attending physician statement. On the progress report, Dr. Duda admitted he was still working and listed his "daily activities" as "knee arthroscopy and office orthopedics." (Lincoln Ex. 34 at LNL 1414).  The supplemental attending physician statement, signed by Dr. Leatherwood, likewise stated Dr. Duda was "still working." (*Id.* at LNL 1244).

In response to the request for medical records, Dr. Duda provided a letter from Dr. Leatherwood, dated March 24, 2009. According to the letter, Dr. Leatherwood had been

"following" Dr. Duda's wrist condition for several years "on a professional curtsy [sic] basis," but kept no "detailed formal records." (Lincoln Fact Statement ¶ 33). The letter did not identify treatments, dates of treatment, or findings from any examinations on specific dates.

In November 2009, at the request of her supervisor Norman Selander-Carrier, Ms. Wallace reviewed and analyzed the CPT codes and financial information submitted by Dr. Duda, which showed no significant loss of income or duties after August 10, 2007. Dr. Duda contends that August 2007 is the wrong timeframe for examining his disability because the wrist injury manifested in 2002-2003 and his practice had already declined by 2007.

On January 4, 2010, Ms. Wallace sent Dr. Duda a letter denying total disability benefits under the Personal Policies.[6] The letter acknowledged that Dr. Duda was claiming disability due to an inability to perform open surgeries, but explained that Dr. Duda did not qualify for total disability benefits because he was still performing arthroscopic surgeries and IMEs. Ms. Wallace also wrote, "We are unable to approve Residual Disability benefits at this time," (LNL 0286), and listed additional information that Dr. Duda must submit before his claim would be considered.

### iii.   Dr. Duda's Appeal

On September 21, 2010, Dr. Duda's counsel sent Lincoln a letter, requesting an appeal of the January 4, 2010 decision denying his total disability benefits. The letter urged Lincoln to "reconsider the initial denial" and threatened litigation based on the January 4 denial of total disability benefits, alleging that Lincoln violated 42 Pa. Cons. Stat. § 8371 "by denying Dr. Duda's claim in bad faith." (Lincoln Ex. 48 at LNL 790, 794).

---

[6] Arguably, Ms. Wallace's letter does not clearly state that Dr. Duda's claim for total disability has been denied. *See* LNL 0285 ("We are unable to consider your claim for Total Disability benefits as you state you are working."). Despite this possible ambiguity, Dr. Duda's next correspondence with Lincoln—a letter requesting an appeal and threatening litigation— implicitly concedes that the January 4, 2010 letter denied his claim for total benefits.

Lincoln referred the appeal to Disability Insurance Specialists, LLC, a third-party claims administrator. That entity assigned the appeal to claims examiner Roberta Bitzer. Ms. Bitzer reviewed the claim file and compiled additional information, including a May 2010 report from Dr. A. Lee Osterman, an orthopedic surgeon who evaluated Dr. Duda's wrist. Dr. Osterman reported that Dr. Duda continued to do arthroscopic surgery, and Ms. Bitzer learned that Dr. Duda continued to maintain surgical privileges and treat patients at Albert Einstein Medical Center.[7]

On three occasions, Ms. Bitzer requested information from Dr. Duda's counsel that was necessary to consider Dr. Duda's eligibility for residual disability benefits. To those requests, Dr. Duda's counsel responded: "While we recognize these additional documents may indeed be relevant to a claim for residual disability . . . [i]t is our view that the focus at this juncture should be exclusively on the claim for total disability . . . . In the event Dr. Duda elects to seek residual benefits at a later point in time, we will then provide the additional information you have requested that relate to residual coverage." (Lincoln Fact Statement ¶ 47).

Dr. Elyssa Del Valle reviewed Dr. Duda's file and found no support for any restrictions or limitations before May 2010 and noted the absence of medical documentation of care and treatment. On June 30, 2011, Dr. Duda's counsel emailed Ms. Bitzer documents in support of Dr. Duda's total disability claim. On September 12, 2011, Dr. Duda's counsel submitted a report signed by Dr. Lewis Sharps. Dr. Sharps noted that Dr. Duda told him that "he had to give up surgery." (Lincoln Fact Statement ¶ 52).

Ms. Bitzer reviewed the file and prepared a written report, recommending the denial of total disability benefits be upheld. Her recommendation was accepted by DIS and approved by

---

[7] To maintain surgical privileges, Dr. Duda had to certify that he was capable of performing surgery.

Lincoln. On November 4, 2011, Ms. Bitzer sent Dr. Duda's counsel a letter notifying Dr. Duda

of the negative decision. The letter explained that because Dr. Duda was still performing IMEs,

still seeing and treating patients, and still performing surgeries, he was still able to perform some

of the "main duties" of his regular occupation and, therefore, was not eligible for total disability

benefits. The letter further noted that DIS was "unable to determine if Dr. Duda is eligible for a

residual benefit," but invited Dr. Duda to submit the information needed to evaluate his claim for

residual benefits. (Lincoln Fact Statement ¶ 55). Dr. Duda never responded to that letter, nor to

Ms. Bitzer's follow-up letter asking whether Dr. Duda intended to pursue a residual disability

claim. After beginning this litigation, Dr. Duda inquired as to how he could "perfect" his claim

for residual disability benefits, but he never completed the forms provided by Lincoln in

response. (Lincoln Fact Statement ¶¶ 68-71).

## II.   LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on

which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of

Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under

governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the

evidence presented on the motion in the light most favorable to the non-moving party. *See

Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere

suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle

Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   DISCUSSION

   1.   Count I – ERISA Claim for Total and Residual Disability Benefits (Standard)

In Count I of the Second Amended Complaint, Dr. Duda asks the Court to award him benefits under § 502(a)(1)(B) of ERISA. Under § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Dr. Duda's main argument is that Standard abused its discretion by defining his Own Occupation without reference to pre-2006 data regarding his practice. Dr. Duda claims that his wrist injury

(which he claims caused his disability) began to manifest in 2002-2003, so as a matter of law, according to Dr. Duda, Standard was supposed to determine the Material Duties of his Own Occupation in reference to the 2002-2003 timeframe rather than the 2006-2007 timeframe.

### A.   Standard of Review

Prior to the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Third Circuit Court of Appeals adopted the view that courts should formulate the standard of review for claims under § 502(a)(1)(B) in light of the conflicts of interest affecting plan administration.[8] *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 392 (3d Cir. 2000). Thus, courts in this circuit "adjusted the standard of review using a 'sliding scale' in which the level of deference we accorded to a plan administrator would change depending on the conflict or conflicts of interest affecting plan administration." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). In *Glenn*, the Supreme Court held that courts should apply a deferential abuse-of-discretion standard of review in cases under § 502(a)(1)(B)—even where a conflict of interest is present—but that conflicts of interest are relevant to the issue of whether an administrator or fiduciary abused its discretion. *Id.* In light of *Glenn*, the Third Circuit Court of Appeals held that the "sliding scale" approach "is no longer valid." *Id.* Instead, courts must examine an administrator's decision under the deferential "abuse of discretion" or "arbitrary and capricious" standard.

---

[8] An ERISA fiduciary making a benefit determination is analogous to a trustee of a common-law trust, and an ERISA benefit determination is analogous to a fiduciary act. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 01, 111-113 (2008). Consequently, as the Supreme Court has directed, the concept of a "conflict of interest" in the ERISA context is generally "guided by principles of trust law," *id.*, and the ERISA standard of review accounts for "the type[s] of conflict[s] that judges must take into account when they review the discretionary acts of a trustee of a common-law trust," *Glenn*, 554 U.S. at 112. For example, "where it is the employer that both funds the plan and evaluates the claims . . . the employer has an interest . . . conflicting with that of the beneficiaries" that may affect the standard of review under ERISA. *Id.*

"Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)). "An administrator's interpretation is not arbitrary if it is 'reasonably consistent with unambiguous plan language." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001)). "When a plan's language is ambiguous and the administrator is authorized to interpret it, courts 'must defer to this interpretation unless it is arbitrary or capricious." *Id.* (quoting *McElroy v. SmithKline Beecham Health & Welfare Ben. Trust Plan*, 340 F.3d 139, 143 (3d Cir. 2003)).

Dr. Duda argues that Standard was predisposed to denying his claim for benefits, and that evidence of bias suggests that Standard abused its discretion.[9] Standard argues that Dr. Duda is attempting to revive the "sliding scale" approach by pointing to various "bias factors," but these "bias factors" are actually reformulations of Dr. Duda's arguments on the merits. The only systemic bias suggesting that Standard abused its discretion is the fact that Standard both evaluates and pays claims. The Court notes the existence of that dual capacity conflict of interest, *see supra* note 8, but Dr. Duda must overcome the deferential abuse of discretion standard to succeed on Count I.

---

[9] In support of his position, Dr. Duda points to the following facts: (1) Standard both evaluates and pays claims; (2) Mr. Picco's decision denied benefits because of an alleged failure to document Dr. Duda's treatment; (3) Ms. Bertha injected a new issue on appeal, thereby denying Dr. Duda the opportunity to respond; (4) Ms. Bertha denied Dr. Duda's claim because she disagreed with Dr. Leatherwood's recordkeeping methodologies; (5) Standard rejected Dr. Leatherwood's opinion that Dr. Duda could no longer perform open surgery, while relying on experts who agreed with that conclusion; (6) Standard treated Dr. Duda's IME practice as if it was part of his surgical practice; (7) Standard refused to look at information from the 2002-2003 timeframe because it knew that Dr. Duda had a robust "open surgery" practice at that time; and (8) Standard refused to consider certain information related to Dr. Duda's surgical practice.

### B.  Dr. Duda's Primary Argument

Dr. Duda's main argument is that Standard abused its discretion because it refused to consider pre-2006 data regarding his actual practice, thereby skewing its analysis and (a) diminishing the importance of open surgeries to his practice, and (b) ignoring the decline in his productivity from the time his symptoms first appeared in 2002 until self-described claimed his disability in 2007. There is no dispute that Standard did not consider pre-2006 data, or that the data from before 2006 shows that, over time, Dr. Duda performed fewer open surgeries and earned less money from those surgeries.

To determine whether Standard abused its discretion, the Court must consider Standard's stated reasons for denying Dr. Duda's claim and compare it to the language of the Group Policy. *See Fleisher*, 679 F.3d at 121 (explaining that the arbitrary-and-capricious standard under ERISA is tied to the language of the plan at issue). The Group Policy defines Own Occupation Disability in three steps: first, the definition of Own Occupation requires Standard to begin with the insured's "regular and ordinary employment" with his Employer (i.e., the actual duties Dr. Duda performed); second, the definition requires Standard to expand its inquiry to cover any duties of the "same general character" as those the insured actually performed; third, the definition of Total Disability requires Standard to expand its inquiry even further to find an occupation involving *Material Duties* of the same general character as the insured's regular and ordinary employment. Thus, incorporating the Group Policy's definition of Material Duties, Dr. Duda's Own Occupation consists of a profession that involves the essential tasks and skills of the same general character as Dr. Duda's regular and ordinary employment with his Employer, but as "generally required by employers" from those engaged in such employment. (STND 630). The

definition of Own Occupation is therefore an objective standard derived from Dr. Duda's subjective responsibilities in practice.

To evaluate Dr. Duda's claim, Standard analyzed his actual responsibilities by looking at his regular and ordinary employment with Northwest and its "other associated entities." (STND 402-03). Standard studied the actual duties he performed from 2006 (approximately 20 months before the claimed date of disability) to 2009 (approximately 22 months after the claimed date of disability). Finding that Dr. Duda performed orthopedic surgery (primarily arthroscopic surgery) and office consultations typical to an orthopedic surgeon, Standard concluded that Dr. Duda's Own Occupation is orthopedic surgeon.[10]

Dr. Duda complains that Standard's focus on the 2006-2009 timeframe mischaracterizes his practice because his degenerative condition had already caused his open surgery practice to shrink by that time. He believes the insignificance of open surgery to his practice from 2006-2009 masked the debilitating effect of his injury. He focuses his argument on three cases: *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381 (3d Cir. 2003), *Kaelin v. Tenet Employee Benefit Plan*, No. 04-2871, 2007 WL 4142770 (E.D. Pa. Nov. 21, 2007), and *Creasy v. Reliance Standard Insurance Co.*, No. 07-3789, 2008 WL 834380 (E.D. Pa. Mar. 26, 2008).

In *Lasser*, the Third Circuit Court of Appeals interpreted a disability insurance policy provision stating that the insured is disabled if, as a result of injury, he is capable only "of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." 344 F.3d at 385. The insurance company in *Lasser* had

---

[10] Although there is no evidence in the record that Standard incorporated Dr. Duda's IME practice into its analysis of Dr. Duda's Own Occupation, it would have been within Standard's rights to do so because Duda PC is an Employer under the Group Policy. If the Court had chosen to remand this case to Standard because of an ERISA violation, there is no question that it would have been decidedly problematic for Dr. Duda to prove that he is disabled in light of his robust IME practice.

interpreted the term "regular occupation" to mean "your own or regular occupation as it is performed in a typical work setting for any employer in the general economy." *Id.* The court of appeals, however, rejected that definition and held that the term's plain meaning is "the usual work that the insured is actually performing immediately before the onset of disability." *Id.* at 385-86. The court of appeals expressly noted that it was unreasonable to define "regular occupation" "differently from its plain meaning . . . *without explicitly including that different definition in the Policy*." *Id.* at 386-87 (emphasis added). As a result, *Lasser* only controls where the phrase "regular occupation" is not defined in the policy.

*Kaelin* and *Creasy* deal with the question of what qualifies as the "onset of disability" for purposes of applying *Lasser*. Both cases involve plaintiffs who suffered serious injuries and ultimately claimed disability benefits after unsuccessfully attempting to return to work in a considerably reduced capacity. In *Kaelin*, the plaintiff was an orthopedic surgeon injured during a jet ski accident who returned to work on a reduced-hours schedule, took time off to have and recover from additional surgeries, and ultimately stopped working. *See* 2007 WL 4142770, at *1. The plaintiff argued that the "onset of disability" was the date of his injury, and the insurer argued that it was the date the insured stopped working. *Id.* at *6. Citing the dictionary definitions of "onset" and "disability," as well as the policy goal of not penalizing insureds for attempting to return to work after an injury, the *Kaelin* court held that the "onset of disability" occurred when the plaintiff suffered his injury, i.e., the skiing accident. *Id.*

Similarly, in *Creasy*, the plaintiff suffered a heart attack and attempted to return to work, but his health prevented him from traveling for work as much as he did before the heart attack. *See* 2008 WL 834380, at *1. Like the policies in *Lasser* and *Kaelin*, the insurance policy did not define the terms "material duties" or "occupation." *Id.* at *2. The insurer looked to the period

22

immediately before the plaintiff's resignation (rather than the period immediately before his heart attack) to determine his material duties. *Id.* at *4. The district court found that analysis to have been an abuse of discretion and remanded for redetermination of the plaintiff's "material duties" while looking at the appropriate, i.e., pre-heart attack, timeframe. *Id.*

Dr. Duda argues that his injury occurred in 2000 and first manifested itself in 2002-2003, so the relevant inquiry into his Material Duties and Own Occupation must begin with that time period, and Standard abused its discretion by defining those terms in relation to his practice from 2006 to 2009. The Court finds that *Kaelin* and *Creasy* are distinguishable because those cases involved injuries that were traumatic rather than degenerative, and resulted in injuries that rendered the plaintiffs actually or imminently disabled. The plaintiffs in those cases could have been considered totally disabled had they stopped working immediately after their traumatic injury because they could no longer perform the material duties of their regular occupations. The courts recognized that the insureds should not be penalized for attempting to return to work after suffering injuries that rendered them actually or imminently disabled. In contrast, according to his claim, Dr. Duda suffered from a degenerative condition that allegedly remained dormant for 2-3 years, and then slowly ate away at his practice.[11] Because Dr. Duda *successfully returned* to practice before the degenerative condition manifested itself, there is no reason to treat his situation differently than any ordinary claim for total disability. The onset of Dr. Duda's disability was therefore August 10, 2007, or the date that Dr. Duda claims marked the beginning of his total disability.

In light of that determination, and because the standard of review is deferential, the Court finds that Standard did not abuse its discretion when it denied Dr. Duda's claim for total

---

[11] The Court notes that the record contains no contemporaneous documentary evidence to suggest any medical or other evaluation of interim difficulties experienced by Dr. Duda. *See infra* note 12 and accompanying text.

disability benefits. It was reasonable for Standard to look at Dr. Duda's practice from 2006 to 2009 because that encompassed the period before and after the alleged onset of his disability. Similarly, it was reasonable for Standard to conclude that Dr. Duda was an orthopedic surgeon, and that arthroscopic surgery was one of his Material Duties under the Group Policy. Per the terms of the Group Policy, Standard was entitled to look at the *general character* of Dr. Duda's actual responsibilities and then to determine Dr. Duda's Own Occupation by considering a profession involving the essential tasks and skills of the same general character as Dr. Duda's regular and ordinary employment. Based on Dr. Duda's practice from 2006 to 2009 and substantial evidence in the record, it was reasonable for Standard to find that Dr. Duda was an orthopedic surgeon, that one of his Material Duties was arthroscopic surgery, and he was not totally disabled because he continued to perform arthroscopic surgery.

Finally, to the extent Dr. Duda argues that Standard abused its discretion by denying his claims for both total and partial disability benefits, the Court notes that the administrative record does not show that the changing role of open surgery in Dr. Duda's practice was *caused* by his injury. The Group Policy required Dr. Duda to submit Proof of Loss, or "satisfactory written proof," that he was entitled to benefits. Standard interprets the phrase "satisfactory written proof" to require *contemporaneous* medical documentation that the insured was disabled during the Benefit Waiting Period. In general, "satisfactory proof" means "[e]vidence that is sufficient to satisfy an unprejudiced mind seeking the truth." Black's Law Dictionary (9th ed. 2009), evidence. Even though it may be plausibly argued that reasonable minds may differ as to whether Proof of Loss required contemporaneous medical documentation, Standard's interpretation and application of that provision are entitled to deference under the arbitrary and capricious standard if they are reasonable. *See Skretvedt v. E.D. DuPont de Nemours & Co.*, 268 F.3d 167, 177 (3d

Cir. 2001) (insurer's interpretation of an ambiguous insurance provision is entitled to deference

unless it is contrary to the plan's plain language). The Court finds that it is reasonable, logical,

fair-minded, and certainly not erroneous as a matter of law to interpret "satisfactory written

proof" of a medical condition as of August 10, 2007, to look for contemporaneous medical

documentation[12] (none of which appears here in this case), so Standard did not abuse its

discretion in denying Dr. Duda's claim for benefits under the Group Policy.

### C.  Dr. Duda's Other Arguments

Dr. Duda's other arguments are unpersuasive. Dr. Duda argues that Standard abused its

discretion by adopting an overly broad definition of Own Occupation, citing *Lasser*'s holding

that the material duties of one's regular occupation are those tasks that the insured actually

performed before the onset of disability. But *Lasser* is inapposite because that case involved a

policy that left the terms "material duties" and "regular occupation" undefined. Here, the Group

Policy includes express definitions of Material Duties and Own Occupation, and those

definitions incorporate elements of Dr. Duda's actual responsibilities as well as objective

elements of skills "generally required by employers from those engaged in a particular

occupation." (STND 630). Dr. Duda's contention that the terms of the Group Policy fall

"woefully short of authorizing an insurer to deny benefits because the insured . . . could possibly

perform a generic hybrid job that is wholly unrelated to the profession or job for which he or she

is insured" is simply inaccurate. (Pls.' Resp. to Standard's Mot. for Summ. J. 20, ECF No. 280-

2). Even *Lasser* expressly notes that it is only unreasonable to define "regular occupation"

inconsistent with its plainest meaning "*without explicitly including that different definition in the*

---

[12] The focus on contemporaneous documentation helps to minimize, if not eliminate, concerns of misrepresentations, puffery, inaccurate hindsight, and the like, not to mention starkly fraudulent claims. At the very least, contemporaneous documentation has a more objective, rather than possibly subjective, character, thus authenticating the claim.

*Policy*." 344 F.3d at 386-87 (emphasis added). Where, as here, that different definition is included in the policy, *Lasser* does not control.

Dr. Duda next argues that Standard's Sandra Bertha rejected Dr. Duda's claim for total disability benefits solely because he was working. This mischaracterizes Ms. Bertha's letter in two ways. First, the portion of Ms. Bertha's letter to which Dr. Duda refers explains why she considered the Group Policy's Partial Disability Definition *in addition to*—not instead of—the Total Disability Definition. Dr. Duda was not denied any benefits simply because he was still working. Second, Ms. Bertha affirmed the reasoning contained in Mr. Picco's letter denying Dr. Duda's initial claim for benefits, and Mr. Picco's letter denied Dr. Duda's claim for reasons other than the mere fact that he was still working. (*See* STND 408 ("[V]ocational information received documents that you have, in fact, continued to work in your Own Occupation *as an Orthopedic Physician*, to include performing a variety of orthopedic surgical procedures. This was explained in Anthony Picco's prior correspondence to you dated August 6, 2009." (emphasis added))). Dr. Duda's claim was only denied because of the type of work he was doing, not the fact that he was still working.

Finally, Dr. Duda argues that Ms. Bertha denied Dr. Duda's claim "because she was dissatisfied with the way Dr. Leatherwood maintained the records of Dr. Duda." (Pls.' Renewed Mot. for Summ. J. 22, ECF No. 269). As described above, this mischaracterizes Ms. Bertha's reasoning. The "Proof of Loss" provision required Dr. Duda to provide "satisfactory written evidence" that he was entitled to disability benefits. Standard interpreted that phrase to require contemporaneous medical documentation of Dr. Duda's condition during the Benefit Waiting Period. As discussed above, under the abuse-of-discretion standard, the Court finds that Standard's interpretation is reasonable and not erroneous as a matter of law.

26

*D. Conclusion*

Standard is entitled to summary judgment on Count I because (a) it was appropriate to look at the 2006-2009 timeframe to determine the Material Duties of Dr. Duda's Own Occupation, (b) Dr. Duda continued to perform arthroscopic surgery, and substantial evidence in the record demonstrates that arthroscopic surgery is a duty generally required of orthopedic surgeons and of the same general character as the work Dr. Duda actually performed before his alleged disability, (c) there was no Proof of Loss showing that Dr. Duda was totally or partially disabled as of August 10, 2007, through the end of the Benefit Waiting Period, and (d) Dr. Duda's other arguments are likewise unpersuasive.

2.   Count II – ERISA Claim for Equitable Relief (Standard)

In Count II, Northwest and Dr. Leatherwood (as a representative of Northwest) (collectively, "the Northwest Plaintiffs") assert claims against Standard under § 502(a)(3) of ERISA. Under § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The Northwest Plaintiffs claim that they are permitted to sue in their capacities as plan fiduciaries. They seek a variety of declaratory judgments regarding Standard's refusal to pay benefits to Dr. Duda, along with an injunction barring Standard from refusing to pay benefits to Dr. Duda.

The parties filed cross-motions for summary judgment on Count II. The Northwest Plaintiffs assert that they should succeed for the same reasons that Dr. Duda should succeed on his claim under § 502(a)(1)(B), especially in light of the fact that suits under § 502(a)(3) are

evaluated de novo rather than under the deferential abuse-of-discretion standard. *See Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1009 n.8 (3d Cir. 1997). Standard responds that it should succeed because (a) the Northwest Plaintiffs lack Article III standing to sue for Dr. Duda's benefits; (b) the Northwest Plaintiffs lack statutory standing because they are not proper plan fiduciaries capable of bringing suit under § 502(a)(3) of ERISA; and (c) the relief sought is legal rather than equitable, and is therefore not permitted under § 502(a)(3) of ERISA. For the reasons that follow, Standard is entitled to summary judgment on Count II.

### A.   Article III Standing

Article III limits the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const., art. III § 2. "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Article III standing is a "threshold jurisdictional requirement" for any case in federal court. *Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron*, 123 F.3d 111, 117 (3d Cir. 1997). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006).

Article III standing has three required elements: "(1) an 'injury in fact'; (2) 'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court'; and (3) a showing that it 'be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *N.J. Physicians, Inc. v. President of United States*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

On the injury-in-fact requirement, the Third Circuit Court of Appeals has explained that

> a plaintiff must allege an injury that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical.' Each of these definitional strands imposes unique constitutional requirements. An injury is 'concrete' if it is 'real,' or 'distinct and palpable, as opposed to merely abstract,' while an injury is sufficiently 'particularized' if it 'affect[s] the plaintiff in a personal and individual way.' The second requirement—'actual or imminent, not conjectural or hypothetical'—makes plain that if a harm is not presently or 'actual[ly] occurring, the alleged future injury must be sufficiently 'imminent.' Imminence is 'somewhat elastic,' but requires, at the very least, that the plaintiffs 'demonstrate a realistic danger of sustaining a direct injury.' In other words, there must be a realistic chance—or a genuine probability—that a future injury will occur in order for that injury to be sufficiently imminent.

*Id.* (citations omitted). "The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72 (1978).

Despite a dearth of cases discussing whether a plan sponsor has Article III standing to sue a plan administrator for the payment of benefits to a plan beneficiary, the Court finds that Northwest and Dr. Leatherwood have Article III standing because they are parties to the insurance contract and have been paying premiums to Standard so that Northwest employees would have insurance coverage. *Cf. Arber v. Equitable Beneficial Life Ins. Co.*, 848 F. Supp. 1204, 1216 (E.D. Pa. 1994) ("[W]e believe that an employer is implicitly empowered under the federal common law governing ERISA to bring a breach of contract action on behalf of itself or its employees against an insurer for denial of those benefits and/or a cancellation of a plan/policy providing for such benefits."). As with most cases involving a third-party beneficiary, the promisee has standing to enforce the promise given. *See* Williston on Contracts § 347 (3d ed. 1959) (noting that, as a general matter, a party to a contract has standing to enforce it and sue for its breach); *Central States Southeast and Southwest Areas Health & Welfare Fund v. Merck-*

29

*Medco Managed Care, LLC*, 504 F.3d 229, 241-42 (2d Cir. 2007) (finding standing in suit by

plaintiff ERISA plan against defendant benefit management company because plaintiff "was

involved in a contractual relationship" with defendant).[13] The harm—denial of benefits to a

beneficiary—is actual or imminent and affects the Northwest Plaintiffs in a personal and

individual way, so the Northwest Plaintiffs have Article III standing.

### B.  Statutory Standing

The Northwest Plaintiffs must also demonstrate that they are entitled to sue under the

particular provision of ERISA that they invoke. "Statutory standing is simply statutory

interpretation," so the question is "whether the remedies provided for in ERISA allow the

particular plaintiff to bring the particular claim." *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725

F.3d 406, 419 (3d Cir. 2013). Standard argues that the Northwest Plaintiffs are not proper

plaintiffs under § 502(a)(3) of ERISA because they are not plan fiduciaries with respect to claim

determinations.

"There are three ways to acquire fiduciary status under ERISA: (1) being named as the

fiduciary in the instrument establishing the employee benefit plan, (2) being named as a fiduciary

pursuant to a procedure specified in the plan instrument, e.g., being appointed an investment

manager who has fiduciary duties toward the plan, and (3) being a fiduciary under the provisions

of 29 U.S.C. § 1002(21)(A), which provides that a person is a fiduciary 'with respect to a plan to

the extent (i) he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management or

---

[13] For example, if Jack pays Jill to paint Bob's house and she fails to perform, Jack has
suffered an injury cognizable under Article III because he is deprived of the benefit of his
bargain. Even though the most direct injury is to Bob (because his house would have been
painted if the contract had been performed), Jack also has Article III standing to enforce the
contract. Here, the Northwest Plaintiffs are parties to the insurance contract and a contrary
interpretation of the Group Policy's terms would deprive them of the benefit of their bargain.

disposition of assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.'" *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Secs., Inc.*, 93 F.3d 1171, 1179 (3d Cir. 1996) (internal citations omitted). An ERISA fiduciary is defined "not in terms of formal trusteeship, but in functional terms of control and authority." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 260-62 (1993). Whether the Northwest Plaintiffs have statutory standing will turn on two inquiries: (1) whether the Northwest Plaintiffs are fiduciaries, and (2) whether a fiduciary may sue for benefits under § 502(a)(3). The answer to both questions is no.

Northwest is not a fiduciary with respect to claims for benefits because, although the Group Policy lists Northwest as a Plan Administrator, the Allocation of Authority provision expressly reserves to Standard the sole discretion to deal with benefit claims. The Northwest Plaintiffs rely heavily on the ERISA Summary Plan Description, arguing that it "contemplates a substantial role in the management of the Plan by the Plan Administrator," and that "[a] Plan Administrator by definition is a fiduciary because of the role the Administrator plays in the management of the Plan." (Pls.' Reply to Standard's Mot. for Summ. J. 28, ECF No. 236-1 (incorporated by reference in Pls.' Resp. to Standard's Mot. for Summ. J. 23, ECF No. 280-2)). But the Summary provides only that Northwest is responsible for responding to service of process, handling contract administration, funding the program, and handling communications with beneficiaries in regard to their rights under the program. It does *not* grant Northwest the authority to participate in claim determinations. Northwest claims an affirmative obligation to protect the Plan and the interests of plan beneficiaries, and that Northwest could be held liable as a co-fiduciary if it did not seek to remedy misdeeds committed by other fiduciaries. However, Northwest only has fiduciary duties to the extent they have functional control and authority over

the plan. *See Mertens*, 508 U.S. at 260-62. As a result, because Northwest is not a fiduciary charged with making claim determinations or capable of being found liable as a result of any breaches committed by Standard in the context of claim determinations, Northwest is not a fiduciary responsible for ensuring that benefits are paid out under the terms of the plan and is not a proper plaintiff under § 502(a)(3).[14]

More importantly, to the extent, if any, that Northwest and Dr. Leatherwood may be considered to be fiduciaries, ERISA does not afford fiduciaries a cause of action for benefits. In *Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc.*, 102 F.3d 712 (4th Cir. 1996), an employer-fiduciary sued an insurance company after the insurer refused to reimburse the employer for expenses paid on behalf of an employee pursuant to a health insurance plan. Chief Judge Wilkinson of the Fourth Circuit Court of Appeals held that fiduciaries cannot seek relief under § 502(a)(3) if a beneficiary could secure that relief under § 502(a)(1)(B) because Congress expressly excluded fiduciaries from entitlement to such relief. *See id.* at 716 ("Benefits cannot be 'appropriate' relief for fiduciaries under section 502(a)(3) when Congress denied them that very remedy under the specific terms of section 502(a)(1)(B)."). The *Coyne* court explained that the structure and text of § 502, along with the relevant case law, show that a fiduciary may not smuggle in claims for benefits under § 502(a)(3) when a participant should bring them under § 502(a)(1)(B).

All of the relief sought by Northwest and Dr. Leatherwood—including the payment of all past benefits, all future benefits, tax compensation, and prejudgment interest—are or would have been achievable by Dr. Duda himself under § 502(a)(1)(B). *See Skretvedt*, 372 F.3d at 193

---

[14] Although there are very few cases discussing the extent to which the scope of a fiduciary's duty limits its ability to be a *plaintiff* under ERISA, the scope of a fiduciary's duties presumably determines the extent to which that fiduciary can file suit under § 502(a)(3). *See Arber v. Equitable Ben. Life Ins. Co.*, 848 F. Supp. 1204, 1214 (E.D. Pa. 1994) ("[I]f [employers] also serve as fiduciaries, they have standing to sue in that capacity.").

& n.15 (suggesting that prejudgment interest and tax compensation may be recovered under § 502(a)(1)(B) and *not* under § 502(a)(3)).[15] As a result, Northwest and Dr. Leatherwood lack statutory standing to bring Count II.[16]

### 3.   Count III – Claim for Breach of Contract on Total Disability (Lincoln)

In Count III, Dr. Duda alleges that he is totally disabled and that Lincoln breached the Personal Policies by failing to pay him total disability benefits. Lincoln argues that summary judgment is proper on Count III for two main reasons: (1) judicial estoppel bars Dr. Duda from claiming total disability benefits because he testified that he was a practicing orthopedic surgeon at the same time that he claims to have been disabled, and (2) Dr. Duda was not totally disabled

---

[15] It is possible that a claim for constructive trust on interest or returns actually earned from wrongfully withheld money would constitute an equitable remedy, but the Northwest Plaintiffs' Second Amended Complaint does not include a claim for interest earned on benefits. Even if it did, "that would not convert the entire suit into a suit for equitable relief." *May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 603 (7th Cir. 2002).

[16] Even if the Northwest Plaintiffs had statutory standing under § 502(a)(3) and their claims were not barred by Dr. Duda's ability to recover benefits under § 502(a)(1)(B), their claims would fail to the extent they seek legal relief rather than equitable relief. Section 502(a)(3) provides for the issuance of injunctions in order to grant "appropriate equitable relief" to aggrieved employees. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002). The Supreme Court has reasoned that equitable relief "must mean something less than all relief," and has limited that provision of ERISA to authorize only "those categories of relief that were typically available in equity" before courts of law and equity were merged. *Id.* at 210. In *Great-West*, the Supreme Court concluded that an injunction to compel the payment of money past due under a contract or specific performance of a past-due monetary obligation was not typically available in equity, so it is not available under § 502(a)(3). *Id.* Here, Northwest and Dr. Leatherwood seek to enjoin Standard from refusing to pay benefits that they claim are due under the terms of the policy. That is essentially an injunction to compel the payment of money past due under a contract and is therefore not a form of relief permitted under § 502(a)(3). The Northwest Plaintiffs attempt to frame their requested relief as "equitable remedies" such as "disgorgement" and "a constructive trust," but using the language of equity does not make it so. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Bollinger, Inc.*, 573 F. App'x 197, 201-02 & n.5 (3d Cir. 2014). In Count II, the Northwest Plaintiffs seek to recover the value of past due benefits, and it is appropriate to characterize that as legal relief. As a result, even if the Northwest Plaintiffs had statutory standing to sue under § 502(a)(3), they are not entitled to any relief under that provision of ERISA because the relief they seek is exclusively legal.

because open surgery was never the *only* main duty of Dr. Duda's regular occupation, and Dr. Duda continued to perform the other main duties of his regular occupation (including IMEs).

### A.  Judicial Estoppel

The doctrine of judicial estoppel prevents litigants from playing "fast and loose" with the courts by advancing inconsistent positions in judicial proceedings. *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 512 (3d Cir. 1953). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4477 (2d ed.).

The elements of judicial estoppel are slightly different under federal and Pennsylvania law. *Compare Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001) ("Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity."), *with Newman Development Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645 (Pa. Super. Ct. 2014) (stating that judicial estoppel applies only if the court concludes (1) that the party assumed an inconsistent position in an earlier action, and (2) that his contention was "successfully maintained" in that action.").[17] However, both federal law and state law provide that a party may only be estopped if he or she asserted positions that are actually inconsistent with one another.

---

[17] The Third Circuit Court of Appeals has expressly avoided the question of whether a federal district court sitting in diversity should apply the state or federal standard for judicial estoppel. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). But the Court need not resolve that issue here because Lincoln's arguments fall short under both standards.

Lincoln argues that Dr. Duda should be judicially estopped from claiming total disability benefits because, as an expert witness in numerous cases, Dr. Duda testified that he maintains a busy, active orthopedic practice. The record shows that Dr. Duda testified to that effect during the period that he claims to have been totally disabled. However, this testimony is not necessarily inconsistent with his claim for total disability benefits, as Dr. Duda argues that total disability means he can no longer do open surgery, even if he can still do arthroscopic surgery. In other words, under Dr. Duda's theory of the case, his expert testimony referred to the fact that he continued to perform *arthroscopic* surgeries even though he had stopped performing total joint replacements. As a result, Dr. Duda's testimony was not "irreconcilably inconsistent" with his position in this case. Lincoln cites a New York case in which judicial estoppel barred a doctor's total disability claim: in one case, the doctor claimed he was totally disabled because he could not perform surgeries; in another case, the doctor testified that he continued to perform surgeries. *See Corines v. Sentry Life Ins. Co.*, 33A.D.3d 443, 443 (N.Y.S.2d 2006). But that case is inapposite because the facts underlying Dr. Duda's claim for total disability benefits do not necessarily conflict with his expert testimony in other cases: in this case, Dr. Duda claims he became totally disabled because he could not perform *open* surgeries; in other cases, he testified that he maintains a busy orthopedic practice, which may include *arthroscopic* surgeries, a conclusion which the Court itself has already reached.

Viewing the evidence in the light most favorable to Dr. Duda, as the Court is required to do at this stage of the litigation, the Court will not apply the doctrine of judicial estoppel because Dr. Duda's expert testimony is not necessarily inconsistent with his claims against Lincoln. If this case were to go to trial, Lincoln would have the opportunity to expand upon or further try to

35

exploit any inconsistency between Dr. Duda's testimony as an expert witness and his claims in this lawsuit, but those inconsistencies will not bar his claims altogether.

### B.   The "Main Duties" of Dr. Duda's Regular Occupation

Dr. Duda argues that Lincoln's denial of benefits was arbitrary, capricious, and irrational for six reasons: (1) Lincoln disregarded clear and convincing evidence showing that open surgery was a main duty of Dr. Duda's occupation as an orthopedic surgeon; (2) Lincoln improperly restricted itself to consideration of duties that Dr. Duda performed after 2006; (3) Lincoln's decision was based on main duty data that did not accurately reflect the duties Dr. Duda was actually performing at the time of the onset of injury; (4) Lincoln improperly considered earnings Dr. Duda received for services beyond those customary to the performance of surgery; (5) Lincoln denied Dr. Duda the opportunity to pursue a second occupation while receiving benefits from a prior occupation; and (6) Lincoln viewed Dr. Duda's regular occupation too broadly, thereby diminishing open surgery's role as a "main duty" of his practice.

Dr. Duda's arguments miss the mark in two important respects. First, Dr. Duda argues that Lincoln's denial of benefits was arbitrary, capricious and irrational, but this is not the standard for breach of an insurance contract. Dr. Duda must prove that Lincoln breached the terms of the Personal Policies, not that Lincoln's actions were arbitrary and capricious or otherwise an abuse of discretion. *See Zayc v. John Hancock Mut. Life Ins. Co.*, 13 A.2d 34, 38 (Pa. 1940); 14 Summ. Pa. Jur. 2d Insurance § 3:2 (2d ed.) ("An insurance policy is a contract which stands on no different basis than any other contract, and is tested and governed by the principles applicable to contracts in general."). In some respects, this burden is lighter. For example, no deference is given to Lincoln's interpretation of the Personal Policies. *See Lexington Ins. Co. v. W. Penn. Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005) (citing *Madison Constr. Co. v.*

*Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999)) ("Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court."). However, this burden is in some respects heavier: Dr. Duda cannot simply poke holes in Lincoln's reasoning to succeed, but rather must prove that Lincoln wrongfully denied him benefits. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002) (explaining that plaintiffs generally must prove "a breach of a duty imposed by the contract," among other things, to "successfully maintain a cause of action for breach of contract"); 16 Couch on Ins. § 232:42 (3d ed.) (noting that plaintiffs must show that "[t]he specific loss falls within the coverage terms of the policy" and "[t]he insurer's obligation to pay has matured" to succeed on a claim for breach of an insurance contract).

Several of Dr. Duda's arguments are insufficient to survive summary judgment because they do not prove that he is entitled to total disability benefits. For example, Dr. Duda stresses that when Lincoln denied his application for total disability benefits, Lincoln believed Dr. Duda had performed a total of 40 open surgeries from 2000 to 2009, but Lincoln now admits that Dr. Duda performed 141 open surgeries between 2002 and 2006. Although Lincoln's reasoning in 2010 was flawed, such a mistake does not prove that Dr. Duda qualified for total disability benefits. Similarly, Dr. Duda argues that Lincoln selectively considered data regarding Dr. Duda's practice before 2006 so that it could deny him benefits. But again, that is not enough for Dr. Duda's claim for breach of contract to survive summary judgment. Rather, Dr. Duda must prove that a fair consideration of the appropriate evidence shows that he is entitled to total disability benefits. Proof that Lincoln's initial reasons for denying total disability benefits to Dr. Duda was flawed is not enough to succeed on his claim for breach of contract. To the extent Dr. Duda tries to demonstrate his entitlement to benefits simply by attacking Lincoln's original reasons for denying his claim, he will not survive summary judgment.

Second, although Dr. Duda spends much time arguing that open surgery was *a* main duty of his regular occupation, Dr. Duda must show that he cannot perform *any* of the main duties of his regular occupation in order to succeed on his claim. Under the Personal Policies, "Total Disability" means "that the insured, due to injury or sickness, cannot perform the main duties of his or her regular occupation." (LNL 2233). In contrast, "Residual Disability" means "that the insured, due to injury or sickness, cannot perform all the main duties of his or her regular occupation full time, but: (a) can and is performing some of those duties; or (b) can perform all those duties, but not full time; or (c) is working at some other occupation." (LNL 2229). Reading the definition of Total Disability in context and in relation to the definition of Residual Disability shows that an insured is only totally disabled if he cannot perform *any* of the main duties of his regular occupation. Lincoln concedes that Dr. Duda cannot perform open surgery and that open surgery was one of Dr. Duda's main duties. But it is not enough that he cannot perform *one* of the main duties of his regular occupation.[18] Rather, the issue is whether there are other "main duties" of Dr. Duda's "regular occupation" and, if so, whether the record shows that Dr. Duda cannot perform them due to injury or sickness. *See, e.g.*, *Hershman v. Unumprovident Corp.*, 660 F. Supp. 2d 527, 533-34 (S.D.N.Y. 2009) (finding that a doctor with two sets of duties— "consultative and invasive"—who can perform one set of duties is *not* totally disabled).

In contrast to the terms "Main Duties" and "Regular Occupation" as used and defined in the Group Policy, the terms "main duties" and "regular occupation" as used in the Personal Policies are *not* defined. As explained above, *see supra* Part III.1.B, the *Lasser* court held that the phrase "regular occupation" in an insurance contract is unambiguous, and its plain meaning

---

[18] For example, Dr. Duda cites *Lasser* to argue that a significant decline in income from one's inability to perform a particular duty can be evidence that the duty is material. Because there is no dispute that open surgery is material, that particular portion of the reasoning in *Lasser* is not material to the outcome of this case.

is essentially a subjective rather than an objective definition. In other words, the insured's "regular occupation" is defined by the tasks actually performed before the onset of disability, not those tasks that are generally required of individuals in the insured's profession. *See Lasser*, 344 F.3d at 386 ("Both the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability."). Consequently, to determine whether open surgery was the only main duty of Dr. Duda's "regular occupation" under the Personal Policies, the Court will consider Dr. Duda's actual responsibilities before the onset of his disability.

i.    Dr. Duda's Orthopedic Practice

It is undisputed that Dr. Duda performed thousands of arthroscopic surgeries from 1998 until 2009. In fact, during each of those years, Dr. Duda performed more arthroscopic surgeries than open surgeries. Although the number of arthroscopic surgeries generally increased and the number of open surgeries generally decreased (allegedly as a result of Dr. Duda's medical condition) from 2002 to 2009, there is no question that arthroscopic surgery was a major part of Dr. Duda's practice. Arthroscopic surgery is therefore one of Dr. Duda's main duties as an orthopedic surgeon, regardless of the time frame considered. Because the record shows that Dr. Duda continued to perform arthroscopic surgeries when Lincoln denied his claim for total disability benefits,[19] Dr. Duda was not totally disabled and Lincoln did not breach the Personal Policies by denying his claim.

_____

[19] Dr. Duda stated in his Fourth Declaration that the cost of malpractice insurance is higher than the amount he could possibly earn performing arthroscopic surgery because of his wrist injury. As a result, Dr. Duda argues that he is totally disabled because his injury precludes his practice of orthopedic surgery from being economically viable. However, this is not enough to survive summary judgment. First, there is no evidence in the record to suggest that Dr. Duda actually stopped performing arthroscopic surgery. All the Court has is Dr. Duda's statement that

Dr. Duda argues that his ability to perform open surgery was critical to his ability to attract new patients, and that his medical condition decimated his referral base and made it difficult to attract even arthroscopic surgery patients. But the crux of the total-disability analysis is whether Dr. Duda was incapable of performing any of the main duties of his regular occupation. His inability to perform open surgery—a single main duty of his regular occupation—does not render him totally disabled because arthroscopic surgery was clearly one of Dr. Duda's main duties. Because open surgery was not Dr. Duda's *only* main duty, and it is undisputed that Dr. Duda continued to perform arthroscopic surgery at the time his claim for total disability benefits was denied, Lincoln is entitled to summary judgment on Dr. Duda's claim for breach of the Personal Policies.

ii.    Dr. Duda's IME Work

The parties dispute whether Dr. Duda's IME practice should be considered part of his "regular occupation," and therefore one of his "main duties" and a source of income to be considered for purposes of residual disability. The undisputed facts in the record show that the "usual work" Dr. Duda was "actually performing" at all relevant times—whether the appropriate timeframe for the inquiry is 2002-2003 or 2006-2007—included a robust IME practice. Lincoln argues that this case is directly controlled by *Lasser*, as the policy has no special definition for "regular occupation," which is an essential component of the definition of "total disability."

---

he *intends* to stop because it is becoming uneconomical. Second, to the extent Dr. Duda has been performing arthroscopic surgery, his claim is better suited for Residual Disability than Total Disability. The definition of Residual Disability includes the insured's performance of the main duties of his regular occupation *part time*. The reduction in his work resembles Residual Disability much more than Total Disability. Finally, if Dr. Duda is only unable to perform arthroscopic surgery beginning in August 2014 and therefore becomes eligible for Total Disability benefits in August 2014—two years after filing suit—then his lawsuit was premature and his true claim for Total Disability benefits has never been properly processed. If Dr. Duda wished to seek entitlement to benefits under that theory, he would have to submit a new claim to Lincoln based on the fact that he can no longer perform arthroscopic surgery.

For two reasons, the Court finds that Lincoln is entitled to summary judgment on Count III. First, because the record shows that arthroscopic surgery was one of Dr. Duda's main duties, whether or not Dr. Duda's IME practice constitutes a "main duty" will not affect the Court's analysis. Even if Dr. Duda was correct that the Personal Policies limited coverage to those duties that are "customary to the performance of Orthopedic Surgery," as he wrote in his application, Dr. Duda's continued performance of arthroscopic surgery is enough to justify summary judgment for Lincoln.

Second, Dr. Duda cannot escape the clear language of *Lasser*. For purposes of determining an insured's "regular occupation," absent some definition in the policy, our Court of Appeals has held that the proper approach is to look at the usual work the insured actually performed before the onset of disability and not at some general definition of the insured's occupation based on his professional title. Because Dr. Duda actually performed a substantial amount of IME work from 2001 to 2009, under binding circuit precedent, IME work is part of his regular occupation.[20]

In his insurance application—which is part of the insurance contract—Dr. Duda lists his occupational duties as "those customarily performed in orthopedic surgery," which would arguably exclude IMEs. He suggests that his IME work is irrelevant to determining whether or not he is totally disabled under the Personal Policies because (a) the only relevant duties are "those customarily performed in orthopedic surgery," and (b) the Court is bound to enforce Dr. Duda's reasonable expectations regarding the contract. As a preliminary matter, even if the

---

[20] Although Dr. Duda argues that the performance of IMEs is not, as a matter of law, a "main duty" of orthopedic surgery (broadly defined), that issue is not necessary to the outcome of this case. Had the policy defined "regular occupation" generally and had a claim been denied because the orthopedic surgeon was capable of performing IMEs but could not perform surgery, then the issue would be squarely presented. However, because that is not the case here, the Court will not decide that particular issue.

policies were limited by Dr. Duda's insurance application, his continued performance of arthroscopic surgery would fall within their scope and summary judgment for Lincoln would be appropriate. Nevertheless, the Court will address each of Dr. Duda's arguments in turn.

First, Dr. Duda does not explain why the text of his application should trump the unambiguous language of the Personal Policies. Under the Personal Policies, Dr. Duda is totally disabled if he can no longer perform the material duties of his regular occupation. As the Third Circuit Court of Appeals held in *Lasser*, the phrase "regular occupation" in this context is unambiguous and refers to the actual duties that the insured performed prior to the onset of disability. Dr. Duda's applications "do not serve as a conclusive definition or explanation of benefits." *Sigal v. Gen. American Life Ins. Co.*, No. 13-169, 2014 WL 4978380, at *10 (W.D. Pa. Oct. 6, 2014). "That Plaintiff indicated in insurance applications what his occupation was at that time he applied for insurance coverage is of no consequence, belabors a finding that the policies are ambiguous, and asks the Court to find an ambiguity where one does not exist." *Id.*

Second, Dr. Duda's reliance on the reasonable expectations doctrine is misplaced. "According to Pennsylvania law, 'the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured.'" *Prudential Property and Casualty Ins. Co. v. Hinson*, 277 F. Supp. 2d 468, 476 (E.D. Pa. 2003); *see Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978)). "In most cases, the parties' reasonable expectations are best evidenced by the language of the insurance policy . . . . Even so, a court must examine the totality of the insurance transaction at issue to ascertain the reasonable expectations of an insured individual." *Prudential Property and Cas. Ins. Co..* 277 F. Supp. at 476. "[G]enerally, courts cannot invoke the reasonable expectations doctrine to create an ambiguity where the policy itself is unambiguous." *Matcon Diamond, Inc. v. Penn Nat'l Ins. Co.*, 815 A.2d 1109, 1114 (Pa. Super.

Ct. 2003). But the Pennsylvania Supreme Court has recognized two limited exceptions whereby insureds will not be bound by the unambiguous terms of an insurance policy: "(1) protecting non-commercial insureds from policy terms which are not readily apparent; and (2) protecting non-commercial insureds from deception by insurance agents." *Id. See also Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 925-26 (Pa. 1987) (distinguishing between cases "where one applies for a specific type of coverage and the insurer unilaterally limits that coverage . . . and cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for."); *Prudential Property and Cas. Ins. Co.*, 277 F. Supp. 2d at 276 ("The clearest of exclusions will not bind an insured where an insurer or its agent has created a reasonable expectation of coverage, and coverage may exist based upon any other reasonable expectations of an insured.").

Dr. Duda argues that he reasonably expected the Personal Policies to cover only his orthopedic surgery practice because his application was included as part of the insurance contract and because his insurance broker represented to him that the contracts would be limited in that way. However, as our Court of Appeals explained in *Lasser*, the definitions of "main duties" and "regular occupation" are unambiguous. Absent ambiguous terms, the reasonable expectations doctrine is generally inapplicable. Furthermore, this case does not fall into either of the recognized exceptions to the general rule because the operative terms were readily apparent and any alleged misrepresentations were made by Dr. Duda's own broker, not Lincoln. As a result, the Court is not free to ignore the clear and unambiguous terms of the Personal Policies.

Dr. Duda's remaining arguments are equally unpersuasive. He argues that the *Kaelin* court held that IMEs cannot be a "main duty" of an orthopedic surgeon because the essence of an

orthopedic surgeon's "regular occupation" is surgery. However, in *Kaelin*, the court noted the absence of evidence to suggest that "seeing patients" was one of the insured's main duties in terms of time or money. *Kaelin*, 2007 WL 4142770, at *9. Here, the undisputed evidence shows that Dr. Duda has had a robust IME practice at all relevant times. Dr. Duda also argues that IME work should be excluded because he did his IME work under a different corporate entity. Nothing in the Personal Policies suggests that Dr. Duda's regular occupation would be limited to his work for Northwest, especially when (a) Duda PC and Northwest operated out of the same office and used the same support staff, and their work was otherwise also heavily coordinated and complementary, and (b) Dr. Duda spent significant time and earned significant money doing IMEs.

The undisputed evidence in the record demonstrates that (a) under the facts of this case, the onset of Dr. Duda's alleged disability coincided with his date of disability, and (b) Dr. Duda cannot demonstrate that he was in fact entitled to total disability benefits under the Personal Policies. Consequently, Lincoln has not breached the Personal Policies by denying Dr. Duda's claim for total disability benefits and Lincoln is entitled to summary judgment on Count III.

4.   Count IV – Bad Faith Denial of Total Disability Benefits (Lincoln)

A.  *Statute of Limitations*

Dr. Duda's bad faith claim against Lincoln is barred by the statute of limitations. Bad faith claims under 42 Pa. Cons. Stat. § 8371 are subject to a two-year statute of limitations. *See Ash v. Continental Ins. Co.*, 932 A.2d 877, 885 (Pa. 2007). The statute of limitations begins to run when a right to file suit arises. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 224-25 (3d Cir. 2005). As a result, the statute of limitations for bad faith claims under § 8371 begins to run when "an insurer clearly and unequivocally puts an insured on notice that he or she will not be covered

44

under a particular policy for a particular occurrence." *CRS Auto Parts Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 365 (E.D. Pa. 2009); *see Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1040 (Pa. Super. Ct. 1999) ("For purposes of applying Section 8371, one must look to the date on which the defendant insurance company first denied the insured's claim in bad faith.").

Lincoln sent its letter denying Dr. Duda's claim for total disability benefits on January 4, 2010,[21] and Dr. Duda filed suit under § 8371 more than two years later. Although the language of Lincoln's letter dated January 4, 2010, is arguably ambiguous,[22] both Lincoln and Dr. Duda have acknowledged that the letter constituted a denial of total disability benefits. (*See, e.g.*, LNL 789-794 (letter from Dr. Duda's counsel dated September 21, 2010, in response to the letter of January 4, 2010, accusing Lincoln of "denying Dr. Duda's claim in bad faith," noting that "Mr. Duda has been wrongfully denied coverage," and urging Lincoln to "reconsider [its] initial denial"); Pls.' Opp. to Lincoln's Mot. for Summ. J. 41, ECF No. 307 ("On January 4, 2010, [Ms.] Wallace denied Dr. Duda's request for disability benefits.")). The allegations in Dr. Duda's Second Amended Complaint and summary judgment briefing are binding judicial admissions that Dr. Duda cannot avoid at this stage of the litigation. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008) (citing *Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004)); *Sikora v. State Farm Ins. Co.*, No. 08-1366, 2009 WL , at *3 (W.D. Pa. Aug. 4, 2009) (granting summary judgment where plaintiff admitted that disputed letter denied coverage); *Romeo v. UnumProvident Corp.*, No. 07-1211, 2008 WL 375161, at *4 (E.D. Pa. Feb. 11, 2008) (finding arguments regarding the date of the initial denial of benefits did not create a genuine issue of material fact when litigation documents and evidence in the record

---

[21] Dr. Duda correctly notes that the letter dated January 4, 2010, did not deny Dr. Duda's claim for residual disability benefits, but that will not toll the statute of limitations on his claim that Lincoln denied him *total* disability benefits in bad faith.

[22] *See* LNL 0285 ("We are unable to consider your claim for Total Disability benefits as you state you are working.").

all indicate that the denial occurred on a particular date). Therefore, having started this litigation on February 27, 2012, Dr. Duda filed suit too late and Count IV is time-barred.

Dr. Duda argues that Lincoln's letter dated January 4, 2010, did not trigger the statute of limitations because he appealed Lincoln's denial of his benefits. However, under Pennsylvania law, appeals of adverse insurance determinations do not toll the statute of limitations. *See Cozzone v. Axa Equitable Life Ins. Society*, 858 F. Supp. 2d 452, 460 (M.D. Pa. 2012) ("[A]n insurance company's willingness to reconsider its denial does not toll the statute of limitations, as the limitations period runs from the time when Plaintiff's claim was *first* denied." (emphasis in original)); *see also Sikirica*, 416 F.3d at 225; *Adamski*, 738 A.2d at 1037. Other than the end of the appeal process, Dr. Duda points to no other date or event that would trigger the running of the statute of limitations. The only conclusion to draw is that Lincoln denied Dr. Duda's claim for total disability benefits by letter dated January 4, 2010. Because Dr. Duda filed his original Complaint on February 27, 2012—more than two years later—his bad faith claim is barred by the statute of limitations.

### B. Merits of Dr. Duda's Bad Faith Claim

Even if Count IV were not barred by the statute of limitations, there is insufficient record evidence from which a reasonable jury could find that Lincoln denied Dr. Duda's claim in bad faith. "To establish bad faith under section 8371, [the court] has utilized a two-part test, both elements of which must be established by clear and convincing evidence: (1) the insurer lacked a reasonable basis for denying coverage; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis." *Adamski*, 738 A.2d at 1036. Dr. Duda lists 17 examples of what he contends is evidence of Lincoln's bad faith.[23]

---

[23] They include: (1) Lincoln's policy of determining an insured's main duties and regular occupation with reference to the date of disability, not the date of injury; (2) Lincoln's policy of

46

No reasonable jury could find that Lincoln lacked a reasonable basis for denying Dr. Duda's claim for total disability benefits. The evidence in the record demonstrates clearly that Lincoln based its decision on the fact that Dr. Duda continued to perform some of the material duties of his regular occupation. *See supra* Part III.3.B. Furthermore, discovery misconduct cannot, as a matter of law, establish bad faith. *See Slater v. Liberty Mut. Ins. Co.*, No. 98-1711, 178367 (E.D. Pa. Jan. 14, 1999) ("Section 8371 provides a remedy for bad-faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit . . . ."). Dr. Duda's reliance on *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. Ct. 2004), is misplaced because *Hollock* permits a claim under § 8371 in connection with bad-faith conduct at trial, not during discovery. Where, as here, the Federal Rules of Civil Procedure provide an adequate means of punishing alleged bad faith via claims for sanctions and the like, it would be improper to permit alleged discovery misconduct to serve as a toehold for a claim under § 8371.

### 5.   Count V – Residual Disability Benefits (Lincoln)

Count V of the Second Amended Complaint alleges that Lincoln breached the insurance contract and violated § 8371 by denying Dr. Duda's claim for *residual* disability benefits in bad faith. Lincoln argues that it is entitled to summary judgment on Count V because Dr. Duda failed to cooperate with the investigation of his entitlement to benefits. "Under Pennsylvania law, an insured has a duty to cooperate in good faith with an insurer's investigation of a covered loss." *Habecker v. Peerless Ins. Co.*, No. 07-196, 2008 WL 4922529 (M.D. Pa. Nov. 14, 2008) (citing

ignoring main duty data from more than 6 months before the date of disability; (3) Lincoln's refusal to consider pre-2006 main duty data; (4) Lincoln's refusal to pay benefits even though "it acknowledges that the justification it used to deny the claim was based on a colossal factual error"; (5) Lincoln's consideration of Duda PC in determining the main duties of Dr. Duda's regular occupation; (6) Lincoln's denial of Dr. Duda's right to engage in another business without giving up his right to benefits; (7) Lincoln's denial of benefits because it disapproves of Dr. Leatherwood's recordkeeping practices; (8) Ms. Wallace's inability to remember anything about her involvement in denying Dr. Duda's claim; and (9) alleged misconduct during discovery. (*See* Pls.' Opp. to Lincoln's Mot. for Summ. J. 42-43 n.24, ECF No. 307).

*Kids Wear Aramingo, Inc. v. Am. Motorists Ins. Co.*, No. 92-1739, 1992 WL 310296, at *1 (E.D. Pa. Oct. 21, 1992). Where an insured fails to cooperate in a claim investigation and that failure "is substantial and causes the insurer to suffer prejudice," the insurer cannot be found liable for failing to pay out benefits. *Verdetto v. State Farm Fire & Cas. Co.*, 510 F. App'x 209, 211-12 (3d Cir. 2013). Prejudice is established, as a matter of law, where the insurer is deprived of information "essential to assess the merits of the plaintiffs' claim in a timely manner." *Habecker*, 2008 WL 4299529, at *5. Whether an insured's actions constitute a material breach of the duty to cooperate is ordinarily a question of fact. *See Forest City Grant Liberty Assocs. V. Genro II, Inc.*, 652 A.2d 948, 951 (Pa. Super. Ct. 1995).

The undisputed evidence in the record demonstrates that Dr. Duda failed to cooperate in the timely investigation of his claim for residual disability benefits. On January 4, 2010, when Lincoln denied Dr. Duda's total disability claim, Lincoln informed Dr. Duda that it lacked the materials necessary to consider his claim for residual disability benefits. Lincoln expressly invited Dr. Duda to provide additional documentation—such as tax returns, paystubs, profit and loss statements, CPT codes, and IME billings—to evaluate his eligibility for residual disability benefits. (LNL 285-86). Dr. Duda never provided the requested documentation. Similarly, after Dr. Duda appealed the denial of his total disability benefits, Ms. Bitzer requested additional documentation from Dr. Duda on three separate occasions. In response, Dr. Duda's counsel instructed her *not* to consider Dr. Duda's eligibility for residual disability benefits. (LNL 316-17 ("While we recognize these additional documents may indeed be relevant to a claim for residual disability, . . . [i]t is our view that the focus at this juncture should be exclusively on the claim for total disability . . . .")). Ultimately, Ms. Bitzer informed Dr. Duda that she was unable to determine his eligibility for residual disability benefits without certain tax information, CPT

billing codes, and profit and loss statements. Dr. Duda never provided that information. Finally, after Dr. Duda initiated this litigation, Lincoln instructed Dr. Duda to complete additional paperwork in order to perfect his claim for residual disability benefits, but Dr. Duda failed to do so.[24]

On this record, no reasonable jury could find that Dr. Duda cooperated in the investigation of his claim for residual disability benefits or that Lincoln suffered no prejudice as a result of Dr. Duda's choices to decline to supply the information. Dr. Duda argues that Lincoln "can point to no legitimate piece of information concerning the plaintiff's claim for total or residual disability he has failed to provide . . . ." (Pls.' Opp. to Lincoln's Mot. for Summ. J. 39, ECF No. 307). But Dr. Duda's failure to cooperate deprived Lincoln of critical information it needed to evaluate his claim for residual disability benefits. For example, the Personal Policies define residual disability in terms of income, so Lincoln needed Dr. Duda's financial statements to determine whether his income qualified him for residual disability benefits. Dr. Duda's refusal to provide that information prevented Lincoln from making a determination about Dr. Duda's eligibility, so Dr. Duda will not be permitted to recover those benefits now. Consequently, Lincoln is entitled to summary judgment on the breach-of-contract element of Count V.[25]

---

[24] According to Dr. Duda, Lincoln requested that he complete a new claim form and he refused to do so in order to avoid any suggestion that his initial claim was defective. But instead of following up with Lincoln, Dr. Duda filed his Second Amended Complaint and added the allegation that Lincoln breached the Personal Policies by failing to pay him residual disability benefits. Without characterizing it as disingenuous, Dr. Duda's concern about the connotation of filing a new claim form is no excuse for the fact that Dr. Duda did nothing to proceed with his claim for residual disability benefits.

[25] Even if Dr. Duda had cooperated with Lincoln, he could not prove that Lincoln wrongfully denied him benefits because he cannot prove that he ever qualified for residual disability benefits. Under the Personal Policies, Dr. Duda is only entitled to residual disability benefits if his total income—including amounts earned from work outside his regular occupation—drops by more than 20% as a result of his disability. When the earnings from Dr. Duda's IME practice are used to calculate his total income, it is clear that Dr. Duda cannot satisfy that 20% requirement. Dr. Duda conceded this at oral argument. (*See* Oral Arg. Tr. 60:20-

Moreover, Dr. Duda cannot recover under a theory that Lincoln denied him residual disability benefits in bad faith because Lincoln never actually denied Dr. Duda's claim for residual disability benefits. Pennsylvania law makes clear that claim denial is essential to a bad faith claim. *See UPMC Health Sys. v. Metropolitan Life Ins. Co.*, 391 F.3d 497, 506 (3d Cir. 2004); *Simon Wrecking Co. v. AIU Ins. Co.*, 350 F. Supp. 2d 624, 632 (E.D. Pa. 2004) ("[T]he Third Circuit held that 'the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits' and there is no bad faith under 42 Pa. C.S. § 8371 without a denial of benefits."). Dr. Duda points to no specific evidence demonstrating that Lincoln formally denied Dr. Duda's claim for residual disability benefits. (*See* LNL 286 ("We are unable to approve Residual Disability benefits *at this time* due to our concerns outlined above about the medical certification and there does not appear to be a loss of income or duties *at this time*." (emphasis added)). Consequently, given the implicit invitation to supplement the submission by way of additional information, and the insurer's acknowledgement of those possibilities, the undisputed evidence in the record shows that Lincoln never made a final claim decision regarding Dr. Duda's eligibility for residual disability benefits and it cannot be the case that his claim was denied in bad faith.

**IV.  CONCLUSION**

For the foregoing reasons, the Court will enter summary judgment for Standard and Lincoln, and against Dr. Duda and the Northwest Plaintiffs.

                                        BY THE COURT:


                                        S/Gene E.K. Pratter
                                        GENE E.K. PRATTER
                                        UNITED STATES DISTRICT JUDGE

---

61:1, ECF No. 322). As a result, even if Dr. Duda cooperated with Lincoln, Lincoln is still entitled to summary judgment on Count V.